M’Giek, C. J.
This is an action of covenant, brought to recovera certain sum therein mentioned.
The defendants plead thereto, that at the June session of the General Assembly of the State of Missouri, in the year 1821, the Legislature of said State passed an act, authorizing the issue of certain loan office certificates, to the amount of $200,000, and pledged the faith and funds of the State for the redemption thereof; and that the Legislature authorized certain commissioners, on behalf of the State, to loan out said certificates, taking from the borrowers thereof, certain obligations for the repayment thereof, according to certain provisions in said act contained; that said loan office certificates, as they were denominated by said act, did issue, andthat they borrowed the amount for which they are sued, of the commissioners; and for that consideration, and none other, they made the covenant to the State, on which the suit is brought. Wherefore, they pray judgment if said denominated loan office certificates are not bills of credit, within the meaning of the 10th section of the first article of the Constitution of the United States, which says, “ no State shall emit bills of credit, &c., ” and if they are liable to have judgment on said covenant against them.
Two questions arise on this case. The first is, are the certificates, which formed the consideration of this covenant, bills of credit, within the meaning of the 10th section of the 1st article of the Constitution of the United States?
And the second is, if they are such bills of credit, can they form the foundation of a contract, which can be enforced in a Court bound to regard the Constitution as the supreme law of the land ?
According to English vocabularies, these certificates are not bills of credit but that they are the sort of thing prohibited by the Constitution, I have no sort of doubt. The history of the times in which the Constitution was formed, proves to me most satisfactorily, that these certificates are nothing else but bills of credit.
When a State attempts to supply the place of a specie currency by the issue of a paper currency, founded on its resources, and sustained, or attempted to be sustained, by its faith, or the just claim it may have of performing i.ts promises, and puts this *322 paper into circulation, as money, "by loan or otherwise, I understand it has emitted bills upon its credit, and has violated the Constitution.
The evil guarded against, is a paper currency founded on the credit of a State. This, by the Constitution, cannot exist; nor shall any State coin money, says the Constitution. Here we see a State cannot make money of paper, nor of the precious metals, nor make any thing but gold or silver coin, a tender in payment of debts. By the act of the Legislature, these certificates shall pay taxes, and all debts due to the Stale, and they shall pay all debts due by the State to its officers, of every description. Thus, we see, it is to be used as money is used; it is to pay taxes and debts, and is to be loaned for an interest, as money is loaned. What more could be required to enable these certificates to take the place of money, unless it were made a tender in payment of debts, instead of gold and silver coin. This, too, by a subsequent act of the same Legislature, (now repealed) was done under such circumstances as left the creditor no reasonable or lawful alternative.
Now to the second point. Can the State recover on this covenant? When the question is first stated, that these certificates are bills of credit, and their emission and existence are contrary to the Constitution, it seems to me, the first answer of the judgment of every one is, that if the issue is unlawful and unconstitutional, so is the lending, the contract of borrowing, and the attempt to recover.
The 6th article and second clause of the Constitution says, this Constitution, &c., shall bs the supreme law of the land, and the judges, in every State, shall be bound thereby; any thing in the Constitution or laws of any State, to the contrary notwithstanding. What is meant by the State judges being bound thereby ? It must mean that they are to execute the provisions of the Constitution, when they come judicially before them ; that when an act is done agreeably to the Constitution they must decide, the act is lawful and right, though a State act should declare the contrary; and that, where the Constitution forbids a thing to be done by a State, the Court must decide the thing unlawful; and that it neither confers nor creates a legal right or benefit to the Slate, which can be enforced to her advantage, though an act of the Legislature should command the contrary.
How else can a judge be bound, to any sensible purpose, by a Constitution, or constitutional act, but by enforcing its command, and refusing to give any aid or assistance to that which seeks a benefit, contrary to a prohibition in the instrument ?
By the same second clause, the State judges are required to be sworn, or affirmed, to support the Constitution. 'What sort of support is this to be ? The judges have none of the leading instruments of power, belonging to a State ; they have neither its sword nor purse. As citizens, they can only support it by not violating its commands, and as judges, by decreeing what it wills, and by refusing to give, by their judgments and decrees, all benefits, claimed in consequence of any act done, which was a violation of the instrument.
This is what I understand by a judge supporting the constitution. If this exposition is just, how can the State recover ? The State cannot recover, because the foundation of this contract, on the part of the State, was a part of the means used to emit bills of credit, and to violate the Constitution. These certificates could not exist by the consent of law, but against its will. The State could not, therefore, lawfully lend that which she could not owe. Can a lawful, and constitutional right accrue to the State, in consequence of an unlawful and unconstitutional act, done by' her ? But it is said no individual right is infringed j that the borrower cannot *323 complain, because no constitutional right of his is violated. The answer to this is, that the constitutional right of every one in the American Union has been violated. Each and all have a right to demand that no such paper shall be emitted. The objection lies against him who seeks a benefit in consequence of an unconstitutional act, in favor of every one against whose interest the benefit is sought.
It has also been argued, that the United States, only, cart complain, and that no Constitution has been violated, as to these defendants. That the other States in the Union have cause of complaint, I have no doubt; and that the defendants can lawfully resist this suit, I have as little doubt. Their exemption is not, that they can appropriate the injury done to another, to themselves. It is not, that any ex post facto law, nor law impairing the obligation of their contract, has passed, but that, by the Constitution, for the welfare of the nation, certain things cannot be done.
No' State .can pass any act of attainder, nor grant any title of nobility. Rut suppose a State should pass an act of attainder against A., corrupting his blood, forfeiting his estate, and vesting it in itself, could any sale the State could make of such estate, vest any title in a purchaser ? My answer is, that the act of attainder would be absolutely void, because repugnant to the supreme law of the land; that the execution of A. would be murder, and that his estate would vest in his heirs, exactly to the same extent it would have done, if the act of attainder had not passed, and he had died by any other way ; and that it would be in vain for the State to repeal all laws on descents and distributions, and felonious homicide ; for, that the title being once lawfully vested in A., could not be divested but by his- consent, or by the act of some authority having competent power to do so. If, by the act of attainder, the State could confer no interest to themselves, nor to their purchaser. It seems to be .a reasonably fair deduction, that if they emit bills of credit, they cannot thereby create any interest in themselves, nor obligation against another; and this is the exemption of the defendants.
I cannot admit the force of the doctrine,- which seeks to establish the distinction, that because the emitting bills of credit is complete, and the Constitution as much violated as it can be, that, therefore, that part of the law which seeks to redress the evil, by calling in the paper, is separate and distinct from the original transaction, and is constitutional. My opinion is, the State must gather the same sort of fruit of which she has sown the seed. She cannot be permitted, with one hand, to pull down the barriers of the Constitution, and with the other, gather the spoils of the ruins. If these principles are not correct, the Constitution is a dead letter; it has no guarranty but the arm of power.
The first section of the act creates five loan offices in the State ; the third directs certain officers to make and send to these offices $200,000; the fifteenth section provides for loaning out the bills on mortgage; the sixteenth, for loaning on personal security; and the twentieth provides the remedy, by suit, in case of a failure to pay. By this, we see the remedy given hv the act to bring in the paper, is a part of the same transaction, and was not intended to be a balsam for the injury done, hut was intended as a part of the means by which the credit of the paper should be sustained, and the State benefilted.
Nor does it, in my opinion, help the matter, that the loan office act has been repealed, and another act passed, authorizing and requiring suit to be brought, with a view to bring in the paper to he destroyed. The question is to be decided precisely as it would he, if the loan office act were yet in force, and the Slate was yet lending *324 out the paper. And if it were so, could any one say, that to enable the State to recover the paper, or money in lieu thereof, would he any atonement for the injury done to the Constitution ? But now, that the paper is in circulation, and constitutes a large debt against the faith and the funds of the State, (as is said by the act,) and that the original project has been abandoned, it is thought to be lawful, by matter ex post facto, to recover and bring in the paper by suit.
It is a happy thing, for the sake of correct principles of government, that the authority by which these bills of credit were emitted, has repented of the wrong; but the borrowers should be allowed to repent likewise.
The original contract of the borrowers cannot be changed by a change in the original intent of the lenders. The original intent was, to lend, collect, and lend again; but now, it is to collect, destroy, and lend no more. If this contract was void in the beginning, it must remain void. The Legislature cannot impair the obligation of a contract; and it would seem, by a sort of reasonable necessity, they cannot increase the obligations of a contract, nor create new obligations to a promise already made, when no such obligation existed before.
The lending, in this case, and not the making, constitute the emission. The lending was unlawful; so was the contract founded on it. If the premises are false, so is the conclusion. If the superstructure is larger than the foundation, it cannot stand.
It is contrary to all law, both human and divine, that the State, or any one else, should claim and recover of any one, a lawful reward for doing an unlawful thing. The State claimed to recover money, and for what? . Because she emitted to the defendants bills of credit, and by doing so, broke (he federal compact, and this money is to be her reward. If it ever was true, it is yet true, and ever should remain so, that those who come into the temples of justice, for law and right, should come with clean hands and pure hearts. In this case can she do so ? She cannot; nor can the distinction between right and wrong, and their concomitants, rewards and punishments, ever be repealed by human power. They emanate from higher fountains. The Legislature may repeal, alter, and modify all the State laws respecting contracts. They may declare what shall be the requisites of a contract, and what shall not. They may declare what is right and what is wrong, and for what an action may be sustained, and for what judgment shall be given, provided they do not overreach the limits of their power. But I deny the State can, by her law-making power, make any law which will give her a remedy, or a right, contrary to the Constitution.
In this case, she seeks a benefit against the Constitution; she seeks a right she could not create, nor can she have a remedy therefor. For, by entering into the federal union, she has solemnly bound herself that she never will emit bills of credit; yet she demands money of the defendants for doing so, for the demand can be for nothing else.
I admit the duty, right, and power of the State, to regulate its own policy; but this can only be true, with respect to such things as she can have a constitutional policy about; but with respect to bills of credit, she cannot make them the subject matter of contract; she can have no policy respecting them, which Courts can regard.
If a State should grant letters of marque and reprisal, or grant titles of nobility, and ship and good3 should be seized, condemned and sold, would it be any answer to the Constitution to reply, true it is, these things are wrong, we will do so no more, but the captors must stand indemnified, the purchasers must hold.the goods, and the *325 titles of nobility must stand; for the wrong being once done, it becomes lawful for "the State to make the most she can of it.
In my opinion, the Constitution ought to he supported, to the full extent of its end and object, which was, that bills of credit should not be in use, nor, perhaps, in existence. To enable the State to recover, is to enable her, at all times hereafter, to flood the country with bills of credit, to drive the constitutional coin of the nation from the land, and to impose upon the people, from time to time, a system of stock-jobbing and shaving, a system of depreciation, with the attendant, a per cent, of discount or advance; in fine, to create a sort of monied nobility, without the pain of useful toil and labor, and to create large fortunes for a few, without any just returns to the rest of mankind, and at the ultimate expense of the unprotected multitude.
These are the chief reasons which lead me to the conclusion, that the Stale cannot recover. Therefore, so far as depends on me, let the judgment of the Circuit Court, in favor of the State, he reversed, with costs.
Pettiuone, ,T.
The State of Missouri brought an action of covenant against the defendants in the Court below, on a sealed note, or writing obligatory, for the payment of two hundred dollars. The defendants pleaded in their defence, three several pleas, which were, in substance, that the consideration of the said writing obligatory was loan office certificates, borrowed by them at the Jackson loan office, under the act of June session, v1821, establishing loan offices; that the said loan office certificates were hills of credit, and were illegally loaned and emitted by the State, under the aforesaid act, in viola-iation of the Constitution of the United States; and that, therefore, the said writing-obligatory was and is void. These pleas were demurred to, and the demurrers sustained, and judgment rendered for the plaintiff; to reverse which judgment, the appeal to this Court is taken.
I have no doubt that the loan office certificates are hills of credit; and that the loaning them, at the different loan offices, under the provisions of tho act aforesaid, was an emission of them by the State, and was a direct violation of the Constitution of the United Slates. There can he no doubt, also, that the illegality of the consideration will render a contract void at the common law. But while I admit the correctness of these several propositions, I can by no means agree with the defendant’s counsel, in'the conclusions which they drew from them.
It certainly will not he denied, that, under our federal system, each State has a right to regulate its own internal policy, on all subjects, when they are not limited by the Constitution of the United States. In what part of the Constitution are they limited in th^ir power of regulating contracts, and fixing their obligations ? They are prohibited from impairing the obligation of contracts, hut not from declaring in what cases an obligation shall arise. We see, not only in our own statute hooks, hut in the legislation of all the States, a very frequent exercise of this power of regulating contracts. In one State, we see them enacting, that all promises in writing, whether founded on consideration or not, shall be binding; in another, that gaming, and usurious contracts, shall be void; in others, that they shall he good and valid. And we find each State regulating them according to her own ideas of policy. We often see them abolish the "best settled, and the most salutary principles of the *326 common law; and although we may doubt their wisdom in this, yet, I believe, no one has ever thought of questioning their power. If the Legislature have a right, then, to alter that rule of, a common law, which requires a consideration, in all cases, to support a promise, why may they not also alter the rule, as to the nature or kind of the consideration? ,
In the ca se before the Court, the' defendants rest their defence upon the illegality of the conside:aiion of iheir note or obligation. It is by no constitutional or immutable princip’e, that such a contract is void ; it is, by an ordinary, but wise principle of the common law, subject to be changed, however, by the will of the Legislature, in the same manner as any other principle of that inestimable code. If I can show that the Legislature have changed this principle, as it relates to this particular species of contracts, this defence must fail.
I can see no difference between an act, made illegal by the Constitution, and an act, m;do illegal by a statute,.or by the common law. In the one case, the iaw is more easily changed than in the other, but so long as they severally remain in force, the illegality of violating them is the same. We have a statute against passing counterfeit bank bills: suppose a person should purchase' a parcel, for the pui-pose of circulation within this State, and should give his note for them. The consideration would'be as illegal, as,if the act we:e prohibited by the Constitution.' Yet it will hardly be contended, that the Legislature have no power to say, that such a note shall be valid.
There is a material distinction between a promise to do a legal act, founded on an illegal consideration, a:.d a promise to perform an illegal act, founded on a good con-sideraton. In the first case, the promise which is to be performed violates no moral or law, nor interferes'with the rights of others. Such a promise may well be der dared valid, then, upon all the principles of justice and morality, and it only remains a question of policy, which every State will settle according to its own particular views. There is -certainly nothing immoral or unlawful in the defendants’ paying back the loan off ee certificates, which they have borrowed. It violates no legal right, no civil or moral duty. It violates no part of the' Constitution of this State, or of the United States. On the contrary, it is discharging a moral obligation, and is, in some measure, healing the wounds, which the emission of these certificates has inflicted. If the Slate has committed an error in emitting this loan office paper, she 's answerable for it; but it is no atonement for that error to allow the borrowers of the paper to escape payment. It neither aggravates not lessens her offence whe'her she compels them to pay or not. But it is said that the spirit and policy of the Constitution will prohibit the States from making these contracts valid. I am for construing the Constitution, as I would all other instruments, according to its gene a1 spirit and intention. But I deny our right to establish a kind of common law code, growing out of what we may please to think the policy of the Constitution, but not contained in any of the enactments. Such a policy would be like flitting shadows in the dark, which indistinctly strike upon the senses, and appear according to the imagination of the beholder, every thing, any thing or nothing. But that spirit or policy of the Constitution which Courts should regard, ought-to have some connection with the body, the written part of that instrument. It should emanate clearly and distinctly from it, like the rays from the sun, shedding a halo of light and beauty about it, which all m:ght see, understand and admire. But granting that there is such an unwritten code, denominated the policy of the Constitution, it stiU, *327 will need argument to prove, that this policy -prohibits the State from making these contracts obligatory upon the borrowers. It must be proved upon new principles^ if it does prohibit the State from enforcing moral obligations, when no individual or public injury can arise therefrom. And I ask again, how is the Constitution violated or the public or individuals injured, by the collections of the obligations? It has been said, that if the State be allowed to collect in this paper, she will re-issue it, and thus inflict new wounds upon the Constitution. Allowing that she would do so, still the evil would be no greater to collect in the paper, and loan it out again, than it would be to leave it in circulation. But it is not a legal presumption, that the State is endeavoring to collect in this paper for the purpose of emitting again. We have no right to presume any such thing. We are bound to presume, that the State always intends to do right. Indeed, by the common law, she could do no wrong. But it is asked, how arc the States to be kept in check? and what guar-ranty is there for the preservation of the Constitution, if the States may violate it, and still be allowed to reap all the benefits and advantages which might result from such violation ? Tiiis Court is not armed with the sword of justice, for the purpose of executing vindictive justice upon the State, for any offences which she may have committed against the Constitution of the United States. They cannot refuse their aid to the State, in the collection of these notes, on the ground that such refusal would be a salutary punishment for her illegal acts, or would operate to deter the State from the repetition of her offence; or, in other words, on the ground of any constitutional policy. To test this constitutional policy, let us suppose Congress were to enact that all obligations, given in consideration of the loan bills of credit, by a State to any of it3 citizens, should be absolutely void. Would we not say, that it was an assumption of power on the part of Congress — an unwarrantable attempt to interfere with our internal policy ? 1 do not hazard much in saying, we should universally disregard such an enactment. Yet, if the policy of the Constitution has already decided them to he void, and that policy is to govern the policy of the Slate, where would be the impropriety in Congress passing such a law ? They surely have the right to re-enact every thing which is contained in the Cor stiluticn, cither in the letter or_the spirit. But again, to return to the question: what'guaranty is there for (463) the preservation of the Constitution, if the States may violate it, and the Courts will aid them in obtaining all the benefits which can result from such violation ? I answer, that as a general rule, the guaranty is placed in the strong arm of the General Government; and if there is not virtue, patriotism and discretion enough in the States to yield an obedience to the principles of the confederacy, the resort, in most cases, must necessarily he to force. The judiciary, from the nature of the duties which it is constituted to perform, often operates as a check upon the Legislatures of the States, in their assumption of unconstitutional power. The courts are expressly organized to settle the rights of individuals, litigating before them, according to law.
The Constitution of the United States is declared to be the Supreme law of the land. If any principle of the Constitution, then, conflicts with any legislative enactment, the principle of the Constitution will remain the rule of law, notwithstanding such enactment, and will be applied as such, by every Court from the highest to the lowest, who are bound to decide according to law, in cases before them, to which it is applicable. It is the same as a conflict between two statutes, containing principles diametrically opposite. Both cannot stand. The first gives way to the last; *328 but as the Constitution cannot be repealed by an act of the Legislature, then, in case of a conflict, the act remains a dead letter. But an act of the Legislature is void only as far as it conflicts with the Constitution. A part of it may be binding, and a part void. That part of the act establishing the loan offices, which conflicts with the Constitution, is the part which provides for the emission of the loan office paper —the means and machinery for forcing it into circulation — but not that part which provides for taking it out of circulation. When the Courts are called upon to assist in getting this paper into circulation, by forcing people to take it, they will refuse their aid ; because it would be aiding in an unlawful act, and violating the rights of individuals 3 but calling in the paper is not unlawful; the Constitution is not violated; the rights of the defendants are not injured thereby. Indeed, the defence has not been rested upon the ground that the defendants ought not to pay, but that the State ought not to recover; that, having committed an illegal act, she is not worthy of grace and favor in her own Courts. The State may accord the grace and favor, or give the right to her citizens to sue on such a contract as this. She surely, then, ought to be allowed to claim grace and favor, and right for herself, in lier own temples of justice, in all cases where she might accord it to others.
I think I have shown that the act which the Court is called upon to enforce, to wit: the payment of this obligation, has no tendency, directly or indirectly, to violate any principle of the Constitution. And I think I have further shown, that the Legislature have the power to declare such contracts good and valid. It now only remains for me to show that they have done so.
It needs no other proof than the general tenor and spirit of the act erecting loan office^, to convince any man that it was the legislative will and intention that these notes, or obligations, founded upon the aforesaid illegal consideration, should create a debt, or obligation to pay, upon the borrowers. But aside from the general spirit of the act, it is so expressly enacted. In the 16th section of the act for the establishment of loan offices, (vide acts of June session, 1821,) it is said that loans may be made on personal securities, deemed good and sufficient, &c.; "which securities shall be jointly and severally bound for the payment of the amount so loaned, with interest,” &c. AlsOj in the 17th section, it is said: " which mortgages s.hall be accompanied with a note for the sum so borrowed, and shall he valid to all intents and purposes” In section 20, it says: “ which notes of hand shall be debts of superior dignity, and paid by executors and administrators next after funeral expenses and charges of last illness.” These quotations are sufficient to show that an express liability is created, by positive enactment, upon the borrowers at the loan offices, to pay; which is certainly sufficient, so far as respects these contracts, to change the principle of the common law above referred to, " that ex turpi causa mm oritur actis.” I am, therefore, clearly of opinion, that the defendants are liable, and that the judgment of the Circuit Court ought to be affirmed 5 and such being the opinion of a majority of the Court,
The judgment is affirmed, with costs.
Tompkins, J.
In this action, the State demands of the defendants two hundred dollars and interest. The defendants, in three several pleas, alledge that the instrument of writing sued on was executed in consideration of the nominal sum of two hundred dollars. *329 loaned them by the State in loan office certificates, emitted in violation of the Constitution of the United States; That these certificates are bills of credit, within the meaning of the Constitution, I have no doubt; and if the act alledged in the pleas be such an emission as the Constitution prohibits, it is, in my opinion, clearly the duty of this Court to reverse the judgment of the Circuit Court. By the tenth section of the Constitution of the United States, it is provided, among other things, i:that no State shall emit bills of credit,”'or “ make any thing but gold and silver coin a tender in payment of debts.”
Before the adoption of the Constitution of the United States, the several States struck paper money, or bills of credit, and with this paper money they paid the debts contracted by themselvesthey also made it a tender in payment of debts due from one citizen to another.
These, in my opinion, are the evils intended to be provided against by that part of the Constitution. Should the State be so unwise as to strike paper money, and authorize its offices to let it pass out of their hands without consideration, nobody, I expect, would contend that this is the evil provided against by the Constitution, when it says no State shall emit bills of credit; because, by that act, no injury is done to any one. In this case the defendants voluntarily came and borrowed, because they thought they could derive a profit from the loan. Had the State paid them these certificates for services rendered, it would have been an emission of bills of credit, (466) within the meaning of the Constitution. The case of the defendants is different. It is my opinion that the judgment of the Circuit Court ought to be affirmed, at the cost of the plaintiff in error.